[No. E036474. Fourth Dist., Div. Two. Aug. 8, 2005.]

BOBBI LAMERE et al., Petitioners, v.
THE SUPERIOR COURT OF RIVERSIDE COUNTY, Respondent;
MICHAEL SALINAS et al., Real Parties in Interest.

### COUNSEL

Holland & Knight, Alex R. Baghdassarian, James Kawahara; Law Office of John Schumacher and John Schumacher for Petitioners.

No appearance for Respondent.

Holstein, Taylor, Unitt & Law, Brian C. Unitt; Velie & Velie and Jonathan T. Velie for Real Parties in Interest.

### OPINION

**RICHLI, Acting P. J.**—Petitioners, defendants in the trial court, are members of the Enrollment Committee of the Temecula Band of Luiseno Mission Indians of the Pechanga Indian Reservation, commonly known as the Pechanga Band (Band). Real parties in interest (real parties), plaintiffs below, were enrolled members of the Band at the time of the commencement of this action.

According to the complaint, defendants have initiated "disenrollment procedures" against plaintiffs on the general ground that the ancestor from whom plaintiffs claimed descent was not one of the "original Pechanga people" and her descendants therefore did not qualify as Band members. Plaintiffs' objections to the procedures are generally as follows:[1] 1) the disenrollment proceedings had been improperly instituted by fewer than 51 percent of the committee members; 2) the tribal chairman had removed several members, leaving an insufficient number to take valid action; 3) members of the

---

[1] We have omitted mention of alleged improprieties which do not directly affect plaintiffs.

committee were improperly reinstated to create a false quorum; 4) the committee is imposing proof requirements on plaintiffs that are more strict than set out in Pechanga law; and 5) the committee acts inconsistently and arbitrarily in deciding whether a person is entitled to membership.

Plaintiffs asserted causes of action for "Violation of Pechanga Band Law," and "Violation of U.S. Law," citing the Indian Civil Rights Act of 1968, title 25 United States Code section 1302.

After certain proceedings, which need not be recounted in detail (including a brief sojourn in federal court, which determined that it did not have jurisdiction and remanded to California), defendants, appearing specially, demurred and moved to quash service of summons on them. The bases for the motions, although related, were technically separate: for the demurrer, that the trial court lacked subject matter jurisdiction over the dispute; and for the motion to quash, that the individual defendants had been acting in the capacity of tribal officials and were therefore immune from suit.

The trial court eventually disagreed and this petition followed.

## DISCUSSION

The issues raised by the petition are significant, but we have elected not to attempt a detailed treatise on Indian law. Although we acknowledge the excellence of the briefs submitted by plaintiffs (as well as those on behalf of defendants), we believe the resolution of the case is relatively clear. In addition, our resolution of the case means that plaintiffs' grievances must be resolved in the political arena, not the judicial forum.

 Plaintiffs base their position that California state courts have jurisdiction over this dispute on "Public Law 280." (28 U.S.C. § 1360.) In pertinent part, it provides that, "Each of the States listed . . . shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country . . . to the same extent that such State has jurisdiction over other civil causes of action . . . ." (*Ibid.*) They argue that as the Band does not have a "tribal court," the state courts therefore operate as de facto "tribal courts" to decide disputes between tribal members. As we will explain, California courts act as "tribal courts," if at all, in only a limited sense, and that sense does not extend as far as plaintiffs argue. Plaintiffs have cited no case, and our research has disclosed none, which purports to apply Public Law 280 to a dispute such as the one here. With some reluctance we

conclude that Congress did not intend the statute to authorize state courts to intervene in a case such as this.[2]

Although it is not directly on point, the seminal case of *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49 [56 L.Ed.2d 106, 98 S.Ct. 1670] (*Martinez*) is not only authoritative but instructive. *Martinez* was a proposed class action brought by a female tribal member and her daughter, suing to obtain membership in the tribe for children who were excluded under a recent tribal ordinance affecting the children of tribal women who married outside the tribe. The children of men who married outside the tribe were *not* excluded, and the plaintiffs charged that the ordinance constituted a violation of the equal protection clause of the Indian Civil Rights Act of 1968. (25 U.S.C. § 1301 et seq.)

■ It had previously been held, and is not now disputed, that Indian tribes are "unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." (*Martinez, supra,* 436 U.S. at p. 56; and see cases cited *ibid.,* at fn. 7.) The Indian Civil Rights Act of 1968 represented an affirmative act of Congress to impose statutory obligations on the tribes. However, without reaching the merits of the plaintiffs' claim, the Supreme Court relied on the absence of an express remedy or language conferring jurisdiction on the federal courts, and noted that, "Creation of a federal cause of action for the enforcement of [the] rights . . . plainly would be at odds with the congressional goal of protecting tribal self-government."[3] (*Martinez, supra,* 436 U.S. at p. 64.) ■ The court also commented that "resolution of statutory issues under § 1302 . . . will frequently depend on questions of tribal tradition and custom which tribal forums may be in a better position to evaluate than federal courts . . . the tribes remain quasi-sovereign nations which, by government structure, culture, and source of sovereignty are in many ways foreign to the constitutional institutions of the Federal and State Governments." Accordingly, it held that federal courts had no jurisdiction over actions to enforce the Indian Civil Rights Act of 1968 (*Martinez, supra,* 436 U.S. at p. 71.)

---

[2] We say "with some reluctance" because, as defendants admit, our ruling means that plaintiffs have *no* formal judicial remedy for the alleged injustice. However, it has been recognized that this lack is sometimes an inevitable consequence to the individual tribal member of the tribe's sovereign immunity. (*Taylor v. Bureau of Indian Affairs* (S.D.Cal. 2004) 325 F.Supp.2d 1117, 1122.) As we will discuss further, tribes have been given broad power to order their own affairs without regard for Eurocentric mores. To the extent that Congress has not chosen to provide an effective *external* means of enforcement for the rights of tribal members, the omission is for Congress to reconsider if and when it chooses.

[3] As the court observed, the Indian Civil Rights Act of 1968 *does* allow "[t]he privilege of the writ of habeas corpus" to "any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe." (25 U.S.C. § 1303.)

■ *Martinez* stands as the primary case recognizing the importance of tribal rights and sovereignty, and the limited extent to which the federal government has chosen to intrude on these concepts. Significantly for our case, the Supreme Court also commented that "A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." (*Martinez, supra*, 436 U.S. at p. 72, fn. 32.) Although *Martinez* arose under the Indian Civil Rights Act of 1968 rather than Public Law 280, its construction of congressional intent and the general disavowal of any congressional purpose to allow general judicial intervention in tribal matters stands as a valuable cautionary statement.

■ We agree with those courts that have found that, in light of *Martinez*, Public Law 280 cannot be viewed as a general grant of jurisdiction to state courts to determine intratribal disputes. (See also *Ackerman v. Edwards* (2004) 121 Cal.App.4th 946, 953–954 [17 Cal.Rptr.3d 517].) Rather, "[t]he primary concern of Congress in enacting Pub.L. 280 . . . was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." (*Bryan v. Itasca County* (1976) 426 U.S. 373, 379 [48 L.Ed.2d 710, 96 S.Ct. 2102] (*Bryan*).) Accordingly, Public Law 280 allowed state courts to enforce their own criminal laws with respect to offenses committed either by or against Indians on Indian land.

With respect to the grant of *civil* jurisdiction, the Supreme Court has acknowledged that the legislative history reflects a "virtual absence of expression of congressional policy or intent . . . ." (*Bryan, supra*, 426 U.S. at p. 381.) However, this provision "seems to have been primarily intended to redress the lack of adequate Indian forums for resolving private legal disputes between reservation Indians, and between Indians and other private citizens . . . ." (*Id.* at p. 383.) Its effect is therefore "to grant jurisdiction over private civil litigation involving reservation Indians in state court." (*Id.* at p. 385.) In our view, this is not a "private legal dispute between reservation Indians," but rather goes to the heart of tribal sovereignty.

It is very clear that Public Law 280 does not provide jurisdiction over disputes involving a *tribe*. As the court noted in *Bryan*, "there is notably absent any conferral of jurisdiction over the tribes themselves . . . ." (*Bryan, supra*, 426 U.S. at p. 389; see also *Ackerman v. Edwards, supra*, 121 Cal.App.4th at 954.) Plaintiffs tacitly acknowledge this fact, as they have not attempted to sue the Band, but have only sued the individual members of the enrollment committee. They insist that the individual member defendants are subject to jurisdiction and the dispute is justiciable. We disagree.

■ It is quite true that individual tribal members have no sovereign immunity from suit *unless* they are acting in official capacities on behalf of a tribe. (See *Turner v. Martire* (2000) 82 Cal.App.4th 1042, 1046 [99 Cal.Rptr.2d 587].) Plaintiffs argue that defendants do not qualify for two reasons: first, they exercised only ministerial authority in reviewing enrollment matters, and second, that in taking the actions of which complaint is made, they acted ultra vires and thus lost any immunity. (*Great Western Casinos, Inc. v. Morongo Band of Mission Indians* (1999) 74 Cal.App.4th 1407, 1421 [88 Cal.Rptr.2d 828].) Neither argument is persuasive.

First, we cannot agree that the enrollment committee is intended to operate in a mechanical matter, exercising no discretion. Although the Band Constitution and other enactments may set out the basic qualifications for tribal membership, it is apparent to us that the committee is necessarily entrusted with substantial discretion in evaluating evidence submitted for its consideration. Perhaps more importantly, in exercising its authority to determine who qualifies as a member of the Band, the committee also necessarily acts as an essential arm of the Band itself. As the Supreme Court observed in *Martinez*, "A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." (*Martinez, supra*, 436 U.S. at p. 72, fn. 32.) Insofar as the committee decides issues of Band membership, we can hardly conceive of a more essential tribal function.

■ Secondly, even if the allegations of the complaint are sufficient to show that defendants were acting ultra vires in the sense that they failed to follow established procedures, the dispute remains essentially between plaintiffs and the Band.[4] Whether or not there is personal jurisdiction over defendants therefore is largely moot. Nor are we persuaded by real parties' assertion that there is no effective redress for misconduct by members of the enrollment committee. According to the Band's "Enrollment Disenrollment Procedure" enacted by the General Council in 1988, the enrollment committee's decision is subject to an appeal to the General Council. The General Council has the authority to "correct any infractions to the disenrollment procedure." It may also "instruct" the committee to reevaluate a disputed

---

[4] The term "ultra vires," meaning "beyond the power," is used in varying senses. A corporation may act within its lawful power, but in violation of the governing law; such an act will not be held ultra vires and although it is wrongful, it can be ratified or validated by conformance to the statutes. (See *Sammis v. Stafford* (1996) 48 Cal.App.4th 1935, 1942 [56 Cal.Rptr.2d 589].) On the other hand, a governmental agency that acts outside of the scope of its statutory authority acts ultra vires and the act is void. (See *Turlock Irrigation Dist. v. Hetrick* (1999) 71 Cal.App.4th 948 [84 Cal.Rptr.2d 175] [irrigation district's attempt to provide *natural gas* service is ultra vires].) It seems more appropriate here to term defendants' actions as being well within their essential authority, although arguably procedurally improper.

matter applying "any specific suggestion for a fair decision." If defendants breached their duties to the Band, the Band may "correct" and "instruct" them.[5] We cannot, and do not, assume that the committee would defy such instructions. We note that a tribe may choose to exercise its "law-applying" power *either* through a tribal court or a "nonjudicial tribal institution" (*Martinez, supra*, 436 U.S. at p. 66); and where a tribe, as here, has provided for an internal appeal of crucial decisions, there is no need for state courts to act as a "tribal court." The fact that the Band may not have a judicial forum appropriate for the resolution of disputes between members concerning such matters as private contracts does not mean that it has not the power to make final determinations of internal tribal matters such as tribal membership.

Finally, to further confirm our decision, we consider the lessons to be learned from the case of *Gallegos v. French* (1991) 2 Okla. Trib. 209 (*Gallegos*), a decision by the Court of Indian Appeals[6] for the Delaware Tribe of Western Oklahoma. The issue was claimed irregularities in a tribal election, with the defendants being members of the "Election Board" who were allegedly not proceeding in accordance with tribal constitutional and other legal provisions. Pertinently, the court held that it had jurisdiction over what it conceded was an "intratribal dispute" because, under the federal regulations establishing the "Court of Indian Offenses," that court was intended to act *both* as a federal agency *and* a tribal court. In the latter role, "the court is exercising the sovereignty of the tribe for which it sits." (*Id.* at p. 232.) As the purpose behind the creation of the Courts of Indian Offenses was similar to that prompting the enactment of Public Law 280 (see *Bryan, supra*, 426 U.S. 373; *Gallegos, supra*, 2 Okla. Trib. at pp. 230–231), it might be argued that under the latter statute, state courts might also be considered "tribal courts" capable of exercising tribal power.

However, as defendants have pointed out, subsequent to the *Gallegos* decision, the governing regulations were amended. Title 25 of the Code of Federal Regulations part 11.104(b) (2005) now provides that "no Court of Indian Offenses may adjudicate an election dispute . . . or adjudicate any internal tribal government dispute." Thus, it is clear that the underlying premise of *Gallegos* was in error. The Courts of Indian Offenses do *not* function as true "tribal courts" and may not interfere in essential intratribal matters.[7]

---

[5] In fact, in March of 2003, the Tribal Council *did* intervene in previous disenrollment proceedings concerning at least some plaintiffs, and issued instructions to the committee "in order that fairness and impartiality may be upheld."

[6] That court sat as a reviewing court for the "Court of Indian Offenses," see *post*.

[7] The *Gallegos* court itself recognized that if the plaintiff had pursued his available tribal administrative remedy, which tribal law declared would result in a "final" decision, the court "may not have been able to rehear the merits. . . ." (*Gallegos, supra*, 2 Okla. Trib. at p. 227.)

The fact that Public Law 280 was not similarly amended is not significant because two different bodies were involved. The Bureau of Indian Affairs amended the federal regulations controlling the Courts of Indian Offenses, but the failure of Congress to act with respect to Public Law 280 does not reflect a meaningful contrasting choice. The Bureau of Indian Affairs may have acted to clarify its regulations in response to a specific perceived error (e.g., the *Gallegos* holding); Congress, on the other hand, was not faced with any similar interpretation of Public Law 280. Thus, real parties can take no comfort from the failure to amend the latter statute.

The jurisdiction to state courts granted by Public Law 280 can hardly be construed to go farther than that conferred upon the Courts of Indian Offenses. Although it is true that the term "internal tribal government dispute" does not expressly include membership issues, it is apparent that such issues are basic to tribal self-governance. The point may be most clearly made by the example of litigation concerning the outcome of an election. If the critical point were the membership rights of certain voters (or rejected voters), obviously, surely the courts could not intervene to make membership decisions. Here, plaintiffs are effectively asking this court to interfere with the Band's determination of "Who is a Pechanga?" and that decision would unavoidably have substantial and continuing effects on the Band's self-governance. Congress cannot have had such an intent in enacting Public Law 280.

In short, we are persuaded that Congress did not intend that the courts of this state should have the power to intervene—or interfere—in purely tribal matters. Insofar as plaintiffs sue for violations of "Pechanga Band Law," it is for the Band to determine what that law is and whether or not it has been violated. The cause of action under the Indian Civil Rights Act of 1968 is also unsustainable in California courts. As *Martinez* explains, Congress chose not to create a *federal* remedy for tribal violations of the act in order to protect tribal autonomy; a fortiori Congress cannot have intended that the various courts of Public Law 280 states *would* have jurisdiction over such claims.[8]

In essence, the federal government has largely elected to entrust Native Americans' civil rights to an "honor system" under which tribes are exhorted to respect and apply United States constitutional principles but cannot be compelled to do so.[9] Whether the potential for corruption in the

---

[8] As was noted *ante*, Congress did provide a federal remedy in habeas corpus. This has been applied by at least one federal court in a somewhat similar case in which the plaintiffs had been "banished" from their tribe. (*Poodry v. Tonawanda Band of Seneca Indians* (2d Cir. 1996) 85 F.3d 874.).

[9] At oral argument, counsel for the tribe stressed that the procedures in place concerning membership issues satisfy the requirements of due process that a party be given notice of the

system created by the influx of gambling wealth to some tribes would justify a change is not for us to decide.[10] If plaintiffs are unable to persuade the tribal council of the merits of their claims, so be it. The courts of this state have no power to intervene.

## DISPOSITION

Let a peremptory writ of mandate issue, directing the Superior Court of Riverside County to vacate its order overruling defendants' demurrer, and to enter a new order sustaining the demurrer without leave to amend on the basis that the court lacks subject matter jurisdiction over the dispute. With respect to defendants' motion to quash, the petition is denied without prejudice as moot. Any discussion of the issue on our part would constitute an advisory opinion, and we decline to do so. (See *Salazar v. Eastin* (1995) 9 Cal.4th 836, 860 [39 Cal.Rptr.2d 21, 890 P.2d 43].)

The parties shall bear their own costs.

McKinster, J., and Gaut, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied November 16, 2005.

---

claims against him and an opportunity to respond. We note that the concept also includes the requirement of an *impartial* decision maker. (*Catchpole v. Brannon* (1995) 36 Cal.App.4th 237, 245 [42 Cal.Rptr.2d 440].) We also note that we understand real parties as raising issues relating to the uneven application of tribal rules.

[10] We do not mean to imply that we accept plaintiffs' claims concerning defendants' motives. Where large sums of money are involved, however, it has long been recognized that the *potential* for corruption always exists.

It is worth noting at this point that the dangers of arbitrary and self-interested action on behalf of powerful tribal members or a tribal majority were raised by Justice White—with examples from the congressional hearings on the Indian Civil Rights Act of 1968—in his dissent in *Martinez*. (*Martinez*, *supra*, 436 U.S. at pp. 81–84 (dis. opn. of White, J.).)