*Notice:  This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| HEALY LAKE VILLAGE, d/b/a MENDAS CHA~AG TRIBE, a Federally Recognized Indian Tribe, | ) ) ) | Supreme Court No. S-14987 |
| | ) | Superior Court No. 4FA-12-01800 CI |
| Appellant, | ) | |
| | ) | O P I N I O N |
| v. | ) | |
| | ) | No. 6890 – April 11, 2014 |
| MT. McKINLEY BANK and HEALY LAKE TRADITIONAL COUNCIL, | ) ) ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Michael P. McConahy, Judge.

Appearances: Michael J. Walleri, Gazewood & Weiner, P.C., Fairbanks, for Appellant.  James D. DeWitt, Guess & Rudd, P.C., Fairbanks, for Appellee Mt. McKinley Bank. Richard D. Monkman and Samuel E. Ennis, Sonosky, Chambers, Sachse, Miller & Munson, LLP, Juneau, for Appellee Healy Lake Traditional Council.

Before:  Fabe, Chief Justice, Stowers, and Bolger, Justices. [Winfree and Maassen, Justices, not participating.]

FABE, Chief Justice.

## I. INTRODUCTION

Members of Healy Lake Village Tribe who claim to constitute the newly elected tribal council brought suit in superior court against Mt. McKinley Bank after the Bank refused to change the signatory authority on the Tribe's accounts to reflect the alleged leadership change. A second group of tribal members, who also claim to represent the Tribe based on a competing election, was granted intervention in order to contest the superior court's jurisdiction. The superior court determined that the fundamental issue in the case was the determination of the legitimate governing body of the Tribe, which was an internal self-governance matter within the Tribe's retained inherent sovereignty. The superior court dismissed the case for lack of subject matter jurisdiction, and the group that brought the initial action now appeals. Because determining the real party in interest would have required the superior court to decide matters solely within the Tribe's retained inherent sovereignty, we affirm the superior court's dismissal of the case for lack of subject matter jurisdiction.

## II. FACTS AND PROCEEDINGS

### A. Tribal Election Dispute

Healy Lake Village, also known as the Mendas Cha~Ag Tribe, is a federally recognized Indian tribe with a tribal constitution adopted in 1997.[1] The tribal constitution provides for the periodic election of a traditional council to serve as the governing body of the Tribe, with the First Chief serving as the presiding officer. A tribal election ordinance was adopted in 1998. Two separate groups each currently contend that they are the properly elected and legitimate traditional council. The

---

[1]    Indian Entities Recognized and Eligible To Receive Services From the Bureau of Indian Affairs, 77 Fed. Reg. 47868, 47872 (Aug. 10, 2012) (providing a current list of federally recognized tribes).

appellant group is led by Robert "Ray" Fifer, and the appellee group is led by JoAnn Polston.

Both the Fifer Group and the Polston Group argue that the election that seated the competing group failed to comply with tribal law and regulations. The Fifer Group alleges a series of actions on the part of JoAnn Polston, beginning as far back as 2007, that it claims violated the tribal constitution. In the Fifer Group's version of events, JoAnn Polston was elected to the tribal council sometime prior to 2007. She then "removed" the former First Chief, installed herself, and had de facto control of the Tribe between 2007 and 2012. According to the Fifer Group, between 2007 and 2012 no tribal elections were held, despite the constitutional provision that calls for tribal council elections to be held the last week of March.[2] The tribal constitution does not state whether elections must be held each year;[3] however, it does specify that the term of office for traditional council members is two years.[4] The record does not contain documentary evidence of elections between 2007 and 2012, nor does the Polston Group claim that elections took place during that period.

The tribal constitution provides for the possibility of tribal courts, but the Tribe has not established one. The tribal council does have the power to establish tribal

---

[2] Traditional Constitution of the Mendas Cha~Ag Tribe, art. 8, § 3:

Section 3. Traditional Council Elections. Elections for Traditional Council positions shall be held the last week in March in Healy Lake. The Council shall set the date and shall give at least two (2) weeks notice of such elections. Notice shall be posted in public places in Healy Lake prior to such elections.

[3] Id.

[4] Id. art. 4, § 6.

courts or other judicial bodies,[5] and the council is given authority to regulate matters such as child custody, domestic relations, and inheritance.[6] The Fifer Group states that there is no tribal court, and the Polston Group does not dispute this fact. The tribal constitution provides for the recall of any member of the tribal council and a special election upon receipt of a "[a] valid petition requesting such recall signed by at least 50% of the qualified voters . . . . If the Council fails to call a special election to consider the recall, the tribal membership may hold a tribal membership meeting to conduct such business."[7] The Mendas Cha~Ag Tribal Election Ordinance also provides a procedure for challenging election results:

> **Section 12. Challenging Election Results**
> As specified in the Constitution, tribal members may challenge election results if the terms of the Mendas Cha~Ag Traditional Constitution or the tribal Election Ordinance are violated. Such challenge may be done through a petition and election process. A petition must be circulated and signed by at least 50% of qualified tribal voters. The petition shall state the violation of the Mendas Cha~Ag Constitution or Election Ordinance. Once presented to the Council, the Council shall hold a new election following the procedures outlined in the Mendas Cha~Ag Constitution and the tribal Election Ordinance. If the Tribal Council fails to hold such an election within 30 days after receiving the petition, the tribal membership may meet to conduct a new election. At such a meeting, 50% of qualified voters shall constitute a quorum.

In 2011 the Fifer Group circulated a petition calling for new elections, which the Fifer Group claims was signed by over 50% of the tribal membership in

---

[5]    *Id*. art. 9, § 3(j).

[6]    *Id*. art. 9, § 3(m)-(o).

[7]    *Id*. art. 7, § 2.

compliance with the constitutional and election ordinance provisions. The Fifer Group alleges that the tribal council, led by Polston, took no action on the petition, and that on April 28, 2012, the tribal membership conducted a tribal election with the assistance and under the observation of the Bureau of Indian Affairs [BIA] Fairbanks Agency Superintendent, Kathy Cline, and Tribal Operations staff from the Tanana Chiefs Conference. The Fifer Group was elected as the tribal council at the April 28 election.

The Polston Group alleges various irregularities in the April 28 election and disputes the Fifer Group's leadership claim. In her affidavit, JoAnn Polston claims that the Fifer Group failed to provide notice of the election to many tribal members and to follow constitutional requirements for recalling a sitting council. She asserts that the election dispute is "solely a matter for my Tribe's resolution" and describes an attempt to resolve the dispute at a tribal "Talking Circle." She asserts that the Fifer Group's claim to majority support rests on a disputed definition of tribal membership: "[the Fifer Group] disputes the membership of many lineal descendants of original Tribal enrollees. Its count of Tribal members is much smaller than actual Tribal membership."

On May 14, 2012, JoAnn Polston issued a notice of elections to be held on July 14, 2012, in Fairbanks. The record contains a certificate and report from a tribal election committee certifying that an election was held on July 14 and that JoAnn Polston was elected as First Chief. The certificate form contains spaces to insert the number of undisputed adult tribal members that were present at the election; these spaces are left blank. The Fifer Group alleges a variety of irregularities and tribal constitutional violations in the July 14 election, including disputed issues of tribal membership. On August 23, 2012, the United States Department of Transportation renewed a federal transportation funding agreement with the Tribe, and JoAnn Polston signed on behalf of the Tribe after informing the Department of the internal dispute.

### B. Tribal Account Access

The Mendas Cha~Ag Tribe has over $1,000,000 on deposit in various accounts with Mt. McKinley Bank. The Bank's deposit agreement form for business accounts opened by legal entities provides that the Bank "may require the governing body of the legal entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the legal entity." Most of the tribal accounts provide for single signatory authority. JoAnn Polston has been a signatory on the accounts since 2005.

After the April 28 election, the Fifer Group informed the Bank that the governing body of the Tribe had changed and sought to gain access to the tribal accounts. On April 30, 2012, Kathy Cline, the BIA Superintendent, sent a letter to Mt. McKinley Bank informing the Bank that she "had official oversight of the 2012 Election for the Healy Lake tribal membership on April 28, 2012 here in Fairbanks and certify its validity. The Bureau of Indian Affairs lawfully recognizes the following elected members [the Fifer Group] to conduct official business on behalf of the Healy Lake Traditional Council."

On May 1, 2012, Cline rescinded her previous letter: "[p]lease [accept] my apologies but I am rescinding my letter dated April 30, 2012. The Bureau of Indian Affairs does not have the authority to certify a tribal election." On the same day, the attorney for the Polston Group sent a letter to the Bank offering his legal opinion that the Fifer Group had no legal authority to act on behalf of the Tribe and requesting that the Bank return full signatory authority to JoAnn Polston. He asserted that the Polston Group remained the current tribal leaders and retained the legal authority to control the tribal bank accounts. On May 7 the attorney for the Fifer Group sent a letter to the Bank reasserting the authority of the Fifer Group, alleging improper accounting and

misappropriation of tribal funds by JoAnn Polston, and requesting that the Bank freeze the tribal accounts until the dispute could be resolved or a receiver appointed. On May 11, 2012, the Bank responded to the Fifer Group and informed them that the accounts could not be frozen until the Bank was indemnified or received a court order. The Bank suggested that the Fifer Group take appropriate action through the Alaska Court System.

The Bank referred the Fifer Group to AS 06.05.145, which it believed pertained to conflicting claims of account ownership and signature authority.[8] On May 18, 2012, Ray Fifer filed an affidavit with the Bank pursuant to AS 06.05.145 to put the Bank on notice that the funds on deposit were held subject to fiduciary

---

[8]    AS 06.05.145 provides:

**Adverse claim to a bank deposit.** Notice to a bank of an adverse claim to a deposit standing on its books to the credit of a person is ineffective unless the adverse claimant procures a restraining order, injunction or other appropriate process against the bank from a court in a cause where the person to whose credit the deposit stands is made a party or executes to the bank in form and with sureties acceptable to it a bond, indemnifying the bank from any liability, loss, damage, costs and expenses on account of the payment of the adverse claim or the dishonor of the check or other order of the person to whose credit the deposit stands on the books of the bank. This section does not apply where the person to whose credit the deposit stands is a fiduciary for the adverse claimant, and the facts constituting that relationship and the facts showing a reasonable belief on the part of the claimant that the fiduciary is about to misappropriate the deposit are made to appear by the affidavit of the claimant.

obligations owed to the Tribe and its members and that Ray Fifer had reason to believe that JoAnn Polston intended to misappropriate the funds.[9]

## C.    Superior Court Proceedings

On June 6, 2012, the Fifer Group filed a petition for declaratory relief against Mt. McKinley Bank to determine the party authorized to act on behalf of the Tribe and access tribal accounts. The petition did not name the Polston Group as a defendant. On July 25 the Bank answered and moved to dismiss pursuant to Alaska Civil Rules 12(b)(7) and 19 for failure to join the Polston Group as an indispensable party. The motion detailed the risk of inconsistent judgments if the Polston Group later filed suit. It also set out the Bank's position that "[t]he dispute here is really about who controls and is the control group for the Tribe. It is a dispute over which the Tribe retains its sovereign rights and this court lacks jurisdiction." The Bank's motion stated that "once the Tribe, the dissenting group and the incumbent group, resolve this dispute regarding control, then the Bank will honor the outcome, including any global settlement signed by all the interested persons or a court order identifying who may speak on behalf of the Tribe."

On July 31 the Polston Group applied for a limited intervention and moved to dismiss the action for failure to join indispensable parties and for lack of subject matter jurisdiction. The Bank joined these motions. The Polston Group asserted that the Tribe did not waive sovereign immunity by this limited intervention. The Fifer Group opposed the motion to dismiss and requested a continuance pursuant to Alaska Civil Rule 56(f) in order to conduct discovery on a variety of matters, including the amount on deposit with the Bank, the source of the funding, government restrictions on the funding, the

---

[9]    *See id.*

terms and conditions of the depository agreements, and relevant waivers of sovereign immunity that may exist.

On August 16 the superior court held a hearing and subsequently issued an order granting the Polston Group's motion to intervene. The superior court concluded that because the Polston Group had been granted intervention, the Bank's Rule 12(b)(7) motion was moot, and the court would consider the motion to dismiss as a Rule 12(b)(1) motion only. The court determined that "[i]n the final analysis the jurisdiction of this court to proceed is the threshold issue."

The court also rejected the Fifer Group's argument that because the Bank's motion included exhibits outside of the pleadings, it must therefore be converted to a motion for summary judgment. The court reasoned that a Rule 12(b)(1) motion, unlike a Rule 12(b)(6) motion, allowed the court to consider materials outside the pleadings. The court therefore denied the Fifer Group's request for Rule 56(f) discovery and considered the documents, letters, and affidavits that the parties had attached to their motions.

On October 16, 2012, the superior court conducted oral argument, and on November 6 granted the Rule 12(b)(1) motion to dismiss. The superior court's order reviewed federal and state case law from other jurisdictions as well as several Alaska decisions. From this review the superior court concluded that "[a] district court oversteps its boundaries of jurisdiction, and acts without authority, where it attempts to interpret a tribal constitution and bylaws, and to address the merits of an election dispute." The superior court acknowledged that some matters are outside of tribal jurisdiction and that there is no dispute that a tribe "can access state courts for relief against a bank doing business in Alaska." But "[w]here a district court must initially resolve an underlying intra-tribal dispute and determine the rightful governing body of the tribe . . . in order to subsequently be able to address a question of law that is

potentially outside the scope of tribal jurisdiction[,] that court lacks jurisdiction to address such matters and to make such a determination."  The superior court treated its subject matter jurisdiction as a threshold issue and did not reach the Polston Group's sovereign immunity arguments or the Fifer Group's comity arguments, reasoning "[t]his court does not reach an issue of comity unless and until issues of subject matter jurisdiction are resolved."  The superior court concluded:

> This claim is really about who controls the tribe.  The court finds that determining who controls the tribe is an internal function involving tribal membership and domestic affairs and lies within a tribe's retained inherent sovereign powers.  The court does not have subject matter jurisdiction to determine who is the real party in interest.  The Fifer Group's factual arguments regarding the merits of the Polston Group's election cannot be decided by this court.

The Fifer Group now appeals the superior court's dismissal of its suit for lack of subject matter jurisdiction as well as its rulings on summary judgment and discovery.

## III.   STANDARD OF REVIEW

Generally, "[w]e review a trial court's procedural decisions for abuse of discretion,"[10] including the denial of a Civil Rule 56(f) motion.[11]

The superior court dismissed the Fifer Group's action for lack of subject matter jurisdiction under Civil Rule 12(b)(1).  "We review *de novo* a superior court's

---

[10]    *Childs v. Childs*, 310 P.3d 955, 958 (Alaska 2013) (citing *Brotherton v. Warner*, 240 P.3d 1225, 1228 (Alaska 2010)).

[11]    *Parson v. Marathon Oil Co.*, 960 P.2d 615, 618 (Alaska 1998) (citing *Gamble v. Northstore P'ship*, 907 P.2d 477, 485 (Alaska 1995)).

decision to dismiss a complaint for lack of subject matter jurisdiction."[12] "In exercising our independent judgment, we will adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[13]

## IV. DISCUSSION

### A. The Superior Court Did Not Commit Reversible Error By Treating The Motion To Dismiss As A Rule 12(b)(1) Motion Or By Denying The Fifer Group's Civil Rule 56(f) Motion To Conduct Additional Discovery.

On July 25, 2012, the Bank answered the Fifer Group's complaint and moved to dismiss pursuant to Alaska Rules of Civil Procedure 12(b)(7) and 19. The Polston Group moved to intervene and moved for the superior court to dismiss on the basis of Civil Rule 12(b)(1) as well as Rules 12(b)(7) and 19, adding the argument that subject matter jurisdiction was lacking because the matter involved a question of tribal self-governance. The superior court considered documents outside of the pleadings to determine whether it should dismiss the action for lack of subject matter jurisdiction, and dismissed the case on that basis. The Fifer Group contends that the consideration of material outside of the pleadings necessitated the conversion of the motion into a motion for summary judgment. The Fifer Group now appeals the superior court's decision not to convert the motion to dismiss into a motion for summary judgment as well as the denial of its Rule 56(f) motion.

The Fifer Group cites *Price v. Unisea, Inc.*, in which we explained that "[w]hen materials outside the pleadings are submitted with regard to a motion to dismiss

---

[12]     *Ruckle v. Anchorage Sch. Dist.*, 85 P.3d 1030, 1033 (Alaska 2004) (citing *Andrews v. Alaska Operating Eng'rs-Emp'rs Training Trust Fund*, 871 P.2d 1142, 1144 (Alaska 1994)).

[13]     *John v. Baker*, 982 P.2d 738, 744 (Alaska 1999) (citing *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

[under Rule 12(b)(6)], the superior court must either explicitly exclude the materials or convert the motion into one for summary judgment under Alaska Rule of Civil Procedure 56."[14] But *Price* addressed only a 12(b)(6) motion.[15]

The superior court expressly stated in its dismissal that it was treating the "motion to dismiss as a 12(b)(1) motion only" as a response to the Fifer Group's conversion argument. The superior court cited federal precedent allowing for consideration of evidence outside the pleadings when deciding a 12(b)(1) motion without thereby converting that motion into one for summary judgment. Indeed, the federal circuit court precedent for this proposition is extensive.[16] Both the Bank and the Polston Group urge this court to adopt the federal precedent and hold that Rule 56(f) does not extend to Rule 12(b)(1) motions. But for the purposes of this case, we do not need to reach the question whether consideration of materials outside the pleadings mandates

---

[14]    289 P.3d 914, 918 (Alaska 2012) (quoting *Kaiser v. Umialik Ins.*, 108 P.3d 876, 879 (Alaska 2005)) (alteration in original).

[15]    *Id.* The text of Rule 12 also only directly addresses conversion of 12(b)(6) motions:

> If, *on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted*, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . .

(Emphasis added.)

[16]    *See, e.g., Taylor v. KeyCorp*, 680 F.3d 609, 612 (6th Cir. 2012); *Muscogee (Creek) Nation v. Oklahoma Tax Comm'n*, 611 F.3d 1222, 1227 n.1 (10th Cir. 2010); *Rodriguez v. Christus Spohn Health Sys. Corp.*, 628 F.3d 731, 734 (5th Cir. 2010); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038-39 (9th Cir. 2004).

conversion of a 12(b)(1) motion into a motion for summary judgment because conversion would not have altered the jurisdictional analysis.

In addressing the conversion requirement of Rule 12(b), we have held that "a reviewing court has three available options when it finds that the trial court has not complied with the conversion requirements of Civil Rule 12(b)":[17]

> One alternative calls for reversal of the superior court for its failure to comply with the requirements of Civil Rule 12(b) and a remand for proper consideration as either a Rule 12(b)(6) dismissal motion with the outside matters expressly excluded or a Rule 56 motion for summary judgment with the attendant requirements of that rule. A second option is to review the superior court's decision as a Rule 12(b)(6) dismissal, treating that decision as if a motion for dismissal had been granted after exclusion of the outside materials as required. A third option is to review the superior court's decision as an entry of summary judgment, treating that decision as if summary judgment had been granted after the necessary conversion of the Rule 12(b)(6) motion into one for summary judgment.[18]

Even if we assume that the superior court should have treated the motion to dismiss as a motion for summary judgment under the third option, the jurisdictional analysis would be the same. The superior court's dismissal in this case was based on the existence of an internal tribal election and membership dispute, and the superior court already had before it the relevant information from the parties regarding the material jurisdictional issues, including affidavits, memoranda, the depository agreements, election notices, and other documents. None of the discovery requested by the Fifer Group would have led to information negating the existence of a tribal election dispute

---

[17]    *Demmert v. Kootznoowoo, Inc.*, 960 P.2d 606, 612 (Alaska 1998).

[18]    *Id.* (quoting *Martin v. Mears*, 602 P.2d 421, 427 (Alaska 1979)).

and thus would not have altered the jurisdictional analysis even in the summary judgment context.[19]

We have upheld a superior court's denial of discovery requests after conversion of a Rule 12(b) motion into a summary judgment motion when the requests were overly broad and not designed to lead to information relevant to the jurisdictional issue.[20] The superior court in this case had before it all the information relevant to the jurisdictional analysis after extensive submissions from all the parties, and the superior court's denial of the Fifer Group's Rule 56(f) motion did not prevent the Fifer Group from presenting all information available on the jurisdictional question. Because none of the requested discovery would have led to information relevant to the jurisdictional analysis,[21] the superior court did not err by treating the motion to dismiss as a

---

[19] The Fifer Group requested discovery from the Bank on "1) the amount on deposit with the Bank, 2) the source of such funding, 3) the federal and state restrictions on such funding, 4) the terms and conditions of the bank depository agreements, and [5]) relevant waivers of sovereign immunity that may exist." The first four items have no relevance to the question of state court subject matter jurisdiction over a tribal election dispute. And the issue of the waiver of sovereign immunity is secondary to the question of which of the competing tribal councils is entitled to invoke sovereign immunity. As discussed below, resolution of the legitimacy of the competing tribal councils entails an impermissible inquiry into matters solely within the Tribe's retained inherent sovereignty.

[20] *Price*, 289 P.3d at 923 ("The superior court did not err in holding that Price's discovery requests were too broad and were not designed to lead to information on the immunity issue.").

[21] In the federal courts, the discovery requested by the Fifer Group has been characterized as "jurisdictional discovery" and its denial has been upheld in "the absence of any specific indication from the [plaintiffs] regarding 'what facts additional discovery could produce that would affect [the court's] jurisdictional analysis.' " *Cheyenne Arapaho Tribes of Okla. v. United States*, 558 F.3d 592, 596 (D.C. Cir. 2009) (first

(continued...)

Rule 12(b)(1) motion or abuse its discretion by denying the Fifer Group's Rule 56(f) motion.[22]

B.      **The Superior Court Correctly Determined That Finding Jurisdiction In This Case Necessitated An Inquiry Into A Tribal Self-Governance Dispute.**

In dismissing the case for lack of subject matter jurisdiction, the superior court concluded that "there is no dispute that the real, fundamental, and initial issue to resolve is who is the real party in interest to prosecute the claim against the bank" and that determining the real party in interest would require reaching the merits of the Fifer Group's factual and tribal law arguments about the legitimacy of the two elections.

The Fifer Group attempts to avoid this conclusion by arguing that the case does not involve an election dispute but is simply a matter of the Bank's obligation under their depository agreement to change account signatories when the Tribe's officials change. The Fifer Group also argues that the identity of the Tribe's current officials is at best a collateral issue raised by the Bank and the Polston Group. The Fifer Group maintains that it does not seek to disturb the finality of tribal elections. But to achieve the relief it seeks, the Fifer Group "ask[s] the Court to give full force and effect to a tribal election which changed leadership in a manner prescribed by the Tribal Constitution." And it is this request, which is at the heart of the dispute with the Bank, that presents the jurisdictional problem.

The Bank and the Polston Group correctly identify the centrality of the dispute over the legitimacy of the competing tribal council elections. The Bank notes

_____

[21](...continued)
alteration added) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005)).

[22]      *Price*, 289 P.3d at 923 ("Since further discovery would not have changed the superior court's immunity analysis, it was properly denied by the superior court."); *see also Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).

that the Fifer Group and the Polston Group offer conflicting facts about who is the legitimate tribal council and conflicting interpretations of the facts and of tribal rules. The Polston Group argues that to determine the "valid leadership" of the Tribe, the state court would be required "to perform a culturally-specific analysis of the interplay between the Tribe's Traditional Constitution, the Tribe's oral history, tribal tradition and tribal customs."[23]

In response, the Fifer Group argues extensively that under tribal law the Polston Group has no colorable claim to tribal authority. The Fifer Group's arguments are explicitly based almost entirely on tribal law; specifically the Fifer Group argues that the Polston Group violated tribal law and that under tribal law the Fifer Group is the legitimate tribal council. The Fifer Group itself states that there is "a material factual dispute over whether the Tribe, under the direction of its duly elected governing body, has filed suit against the Bank." The Fifer Group acknowledges that JoAnn Polston had leadership authority over the Tribe and signatory authority over the tribal accounts prior to the April election.

The Fifer Group is asking the state court to force the Bank to change signatory authority, which would require the court to evaluate the alleged violations of

---

[23]    In a footnote, the Polston Group details issues that it believes the superior court would be required to determine, including:

> Tribal custom concerning timing and frequency of elections, interpretation of the Tribe's Traditional Constitution, the membership status of a large number of individuals who claim Tribal membership, whether these Tribal members are direct or culturally adopted descendants of those on the Tribal base roll, which elders have knowledge of Tribal custom and law and what do to [sic] if they disagree, and whether Tribal law allows meetings and elections in Fairbanks in the summer, rather than at Healy Lake during break up.

tribal law and contested definitions of tribal membership. Therefore, we conclude that the superior court was correct in its view that it could not have resolved the Fifer Group's claim against the Bank without an inquiry into the legitimacy of the competing tribal elections.

C.    **The Superior Court Properly Dismissed This Case For Lack Of Subject Matter Jurisdiction Because Determining The Real Party In Interest Would Have Required The Superior Court To Decide Matters Solely Within The Tribe's Retained Inherent Sovereignty.**

1.    **General jurisdictional framework**

The Fifer Group argues that jurisdiction in this case is a straightforward matter of state courts having jurisdiction over a claim by a tribe against a non-Indian bank that arose outside of Indian country. The Fifer Group cites our decision in *John v. Baker*[24] as establishing the general framework for analyzing state court jurisdiction over internal tribal matters. The Fifer Group focuses specifically on our holding in *John v. Baker* that Alaska state courts retain concurrent jurisdiction over the type of child custody disputes at issue in that case, and quotes our statement that "[o]utside Indian country, all disputes arising within the State of Alaska, whether tribal or not, are within the state's general jurisdiction."[25] The Fifer Group reasons that because its claim arose outside of Indian country and concerns an Indian plaintiff and non-Indian defendant, the state courts have jurisdiction.

Neither the Bank nor the Polston Group disputes that the state court would have jurisdiction over a claim of the Tribe against the Bank if there were no dispute about tribal elections and legitimate tribal authority. But the Bank argues that the language in *John v. Baker* quoted by the Fifer Group must be understood in the specific

---

[24]    982 P.2d 738 (Alaska 1999).

[25]    *Id.* at 759.

context of that case, which we articulated as "the existence of concurrent state-tribal jurisdiction over tribal family law disputes when one or both parents do not reside on reservation land."[26]

In *John v. Baker*, we began our analysis of tribal sovereign power to regulate internal affairs with "the established principle under federal law that 'Indian tribes retain those fundamental attributes of sovereignty . . . which have not been divested by Congress or by necessary implication of the tribe's dependent status.' "[27] We recognized that modern tribal sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, . . . Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status."[28] We characterized United States Supreme Court precedent as articulating "a core set of sovereign powers that remain intact even though Indian nations are dependent under federal law; in particular, internal functions involving tribal membership and domestic affairs lie within a tribe's retained inherent sovereign powers."[29] We also reiterated a principle found in an earlier Alaska case that "Indian affairs are subject to state law but only to the extent that Congress explicitly so provides."[30]

---

[26]     *Id.* at 759-60.

[27]     *Id.* at 751 (omission in original) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146 (1982)).

[28]     *Id.* (omission in original) (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)).

[29]     *Id.* (citing *Wheeler*, 435 U.S. at 326; *Montana v. United States*, 450 U.S. 544, 564 (1981)).

[30]     *Id.* (quoting *Ollestead v. Native Vill. of Tyonek*, 560 P.2d 31, 33 (Alaska
(continued...)

In *John v. Baker*, we discussed the "dual nature" of Indian sovereignty, extending beyond territorial control[31] to issues of membership and self-governance.[32] We reaffirmed that the "key inquiry" according to the United States Supreme Court is

> not whether the tribe is located in Indian country, but rather whether the tribe needs jurisdiction over a given context to secure tribal self-governance: "If state-court jurisdiction over Indians . . . would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law."[33]

In finding concurrent jurisdiction, we quoted approvingly a Montana decision that noted "that recognition of concurrent jurisdiction reflected the delicate balance under federal law of a state court's 'obligation to respect the sovereignty of Indian tribes in relation to [the court's] responsibility to uphold and enforce the laws of this state.' "[34] As the Polston Group recognizes, state court jurisdiction was appropriate

---

[30](...continued) 1977)).

[31]    This court has held that "[a]lthough Alaska no longer contains Indian country, its Native villages 'retain those fundamental attributes of sovereignty . . . which have not been divested by Congress or by necessary implication of the tribe's dependent status.' " *Runyon ex rel. B.R. v. Ass'n of Vill. Council Presidents*, 84 P.3d 437, 439 (Alaska 2004) (quoting *John*, 982 P.2d at 751). One of these attributes is "the common-law immunity from suit traditionally enjoyed by sovereign powers" which would seem to be at least one important limiting factor for the expansive reach of state court jurisdiction argued for by the Fifer Group. *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978)).

[32]    *John*, 982 P.2d at 756.

[33]    *Id.* (omission in original) (quoting *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 15 (1987)).

[34]    *Id.* at 760 (alteration in original) (quoting *In re Marriage of Skillen*, 956 (continued...)

in the child custody dispute at issue in *John v. Baker* because it furthered the state and federal laws designed to protect Alaska Native children without interfering with tribal self-governance. And unlike in the child custody context, the State of Alaska has no cognizable interest in determining the outcome of this tribal leadership dispute in place of a determination by the Tribe itself.[35] Instead this case involves the identification of tribal members and compliance with tribal election procedures which the Polston Group and the Bank argue are issues reserved exclusively to the Tribe. We agree.

Because the state has no interest in determining the outcome of this internal tribal dispute, the tribal election and membership dispute in this case remains within the "tribe's retained inherent sovereign powers."[36] We therefore conclude that the state court lacks subject matter jurisdiction in this case because the state lacks an interest, and the exercise of jurisdiction would require the state court to apply tribal law to determine the outcome of a tribal election dispute and issues of tribal membership.

**2. Federal and state precedent involving jurisdiction over tribal election disputes**

Federal and state precedent emphasizes the need to respect tribal self-governance when resolving a claim that entails review of tribal elections. This precedent supports our conclusion that the superior court's dismissal for lack of subject matter jurisdiction was proper.

---

[34](...continued)
P.2d 1, 18 (Mont. 1998)).

[35]     The Bank adds that this case does not involve issues of child custody, state taxation, or even the state law of contracts and banking.

[36]     *John*, 982 P.2d at 751 (citing *United States v. Wheeler*, 435 U.S. 313, 326 (1978); *Montana v. United States*, 450 U.S. 544, 564 (1981)).

The Eighth Circuit reached a similar conclusion in a series of decisions arising from an election dispute with facts similar to the current case.[37] In 2003 two groups were competing for control of the tribal government of the Sac and Fox Tribe of Mississippi in Iowa, a federally recognized Indian tribe.[38] One group had been in power prior to 2003, and an opposition group submitted petitions challenging the incumbent group's authority.[39] According to the tribal constitution, receipt of such petitions mandated a special election, but the incumbent group did not call an election.[40] Like Healy Lake Village, the Sac and Fox Tribe did not have a tribal court, so the petitioning tribal members had no legal recourse or tribal remedy available other than appeal to the incumbent group, which was rejected.[41] The opposition group formed a new tribal government and gained control of some of the tribe's assets, including the tribal casino.[42] The opposition group notified the banks that held gaming proceeds that it was the only group with authority to act on behalf of the tribal accounts.[43] Faced with uncertainty over which group possessed authority to act on behalf of the tribe, the banks froze the

---

[37] *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Mississippi in Iowa*, 609 F.3d 927 (8th Cir. 2010); *Sac & Fox Tribe of the Mississippi in Iowa, Election Bd. v. Bureau of Indian Affairs*, 439 F.3d 832 (8th Cir. 2006); *In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.* (*Meskwaki Casino Litig.*), 340 F.3d 749 (8th Cir. 2003).

[38] *Meskwaki Casino Litig.*, 340 F.3d at 751.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.* at 751-52.

[43] *Id.*

accounts.[44] Federal litigation ensued, and the district court dismissed the action, concluding that it lacked subject matter jurisdiction to decide an intra-tribal dispute.[45] The Eighth Circuit upheld the district court's dismissal of the claims involving intra-tribal matters.[46]

In *Meskwaki Casino Litigation*, the Eighth Circuit reaffirmed its earlier holding that the non-gaming claims in the case were "non-justiciable" because "[t]hey seek a form of relief that the federal courts cannot provide, namely, resolution of the internal tribal leadership dispute."[47] While none of the non-gaming claims were expressly framed as an election dispute, the court determined that "[r]elief unrelated to gaming could only be granted to the extent the court could first resolve the intra-tribal dispute and determine whether the [opposition group] was the rightful governing body of the tribe."[48] "Jurisdiction to resolve internal tribal disputes, interpret tribal constitutions and laws, and issue tribal membership determinations lies with Indian tribes and not in the district courts."[49] The court relied on earlier precedent characterizing an election dispute between competing tribal councils as a non-justiciable intra-tribal

---

[44] *Id.*

[45] *Id.* at 752-53.

[46] *Id.* at 767.

[47] *Id.* at 763.

[48] *Id.* at 764.

[49] *Id.* at 763 (citing *United States v. Wheeler*, 435 U.S. 313, 323-36 (1978) (noting that Indian tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory")).

matter.[50] In 2010 the Eighth Circuit characterized its 2003 decision as reaffirming "the long established principle that '[t]ribal election disputes, like tribal elections, are key facets of internal tribal governance and are governed by tribal constitutions, statutes, or regulations.' "[51] The court then reiterated its holding that "[b]ecause tribal governance disputes are controlled by tribal law, they fall within the exclusive jurisdiction of tribal institutions."[52] Other federal decisions[53] dealing with access to tribal bank accounts after an election dispute reach the same conclusion as the Eighth Circuit.[54]

---

[50]     *Id.* at 764 (citing *Goodface v. Grassrope*, 708 F.2d 335, 339 (8th Cir. 1983) ("[T]he district court overstepped the boundaries of its jurisdiction in interpreting the tribal constitution and bylaws and addressing the merits of the election dispute.")).

[51]     *Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Mississippi in Iowa*, 609 F.3d 927, 943 (8th Cir. 2010) (alteration in original) (quoting COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.06[1][b][i] (5th ed. 2005)).

[52]     *Id.* The Fifer Group attempts to reframe the issue as a matter of exhaustion of tribal remedies. But even when courts, both federal and state, have been confronted with situations where a tribe lacked a tribal court with jurisdiction over a self-governance dispute, they have concluded that the dispute remained a matter of internal tribal self-governance. *See In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d at 751; *Lamere v. Superior Court*, 31 Cal. Rptr. 3d 880, 886 (Cal. App. 2005).

[53]     *See, e.g.*, *U.S. Bancorp v. Ike*, 171 F. Supp. 2d 1122, 1125 (D. Nev. 2001) ("Deciding a question involving a tribal election dispute is solely a matter of tribal law, and we do not have jurisdiction to address this question."); *Timbisha Shoshone Tribe v. Kennedy*, 687 F. Supp. 2d 1171, 1185-86 (E.D. Cal. 2009) (concluding that the plaintiffs lacked standing in federal court because resolving their claim would require the court "to consider tribal law as it relates to elections and enrollment in the Tribe").

[54]     Against the weight of this federal precedent, the Fifer Group cites *Houlton Band of Maliseet Indians v. Boyce*, a Maine Supreme Court case concerning competing tribal councils. 688 A.2d 908 (Maine 1997). Although the Maine Supreme Court upheld the trial court's exercise of jurisdiction, the court's language is cautious, reasoning that the trial court did "not improperly invade the Band's sovereignty" because it "declined

(continued...)

We conclude that the weight of the precedent supports the superior court's conclusion that it lacked subject matter jurisdiction because determining the real party in interest would necessitate resolving a disputed tribal election.[55]

### 3. Decisions involving issues of disputed tribal membership

Our decision is further supported by the precedent on jurisdiction over tribal membership disputes. The Fifer Group and the Polston Group dispute the membership claims of persons who signed the Fifer Group's election petition and persons who voted in the competing elections. Determining whether either group properly complied with the election and election dispute procedures may require an individual inquiry into whether the persons who participated were in fact tribal members, and such an inquiry by the state court would likely be an infringement of tribal sovereignty.

In *Santa Clara Pueblo v. Martinez*,[56] the United States Supreme Court held that "[a] tribe's right to define its own membership for tribal purposes has long been

---

[54](...continued)
to declare the legitimacy of any members of the tribal council" or the legitimacy of the disputed election and because it narrowly tailored its order to "address the immediate [public order] crisis." *Id.* at 909-11. The court's exercise of jurisdiction in that case was also supported by a federal statute that specifically subjected this particular tribe to the "civil and criminal jurisdiction of the courts of the State" as well as the state implementing statutes. *Id.* at 910 (quoting the Maine Indian Claims Settlement Act, 25 U.S.C. §§ 1721-1735 (1983 & Supp. 1996)). The current case lacks any such statute or issue of public order.

[55] The majority of the cases in which jurisdiction was found involved federal statutory grants of jurisdiction, which the Fifer Group does not claim are present here.

[56] 436 U.S. 49 (1978).

recognized as central to its existence as an independent political community"[57] and therefore federal court jurisdiction was lacking in cases necessarily implicating tribal membership disputes unless Congress has specifically provided for jurisdiction.[58] In a more recent California decision, the California Court of Appeals concluded that the state courts lacked jurisdiction in a case involving the disenrollment of tribal members.[59] The court did not find express Congressional authorization of state court jurisdiction and concluded that without such authorization, subject matter jurisdiction was lacking.[60] The court noted that the tribe did not have a tribal court which meant that the tribal members had no formal judicial remedy for their alleged injury.[61] However, the court decided that "this lack is sometimes an inevitable consequence to the individual tribal member of the tribe's sovereign immunity. . . . To the extent that Congress has not chosen to provide an effective *external* means of enforcement for the rights of tribal members, the omission is for Congress to reconsider if and when it chooses."[62] The court compared the disenrollment dispute to "litigation concerning the outcome of an election" and noted

---

[57] *Id.* at 72 n.32.

[58] The Supreme Court held that the federal courts had no jurisdiction over actions to enforce the Indian Civil Rights Act, with the only exception being the express statutory authority to hear habeas claims. *Santa Clara Pueblo*, 436 U.S. at 60-62, 72. The Court noted that "Congress' authority over Indian matters is extraordinarily broad, and the role of courts in adjusting relations between and among tribes and their members correspondingly restrained," *id.* at 72, and that "[c]reation of a federal cause of action for the enforcement of rights . . . plainly would be at odds with the congressional goal of protecting tribal self-government," *id.* at 64.

[59] *Lamere v. Superior Court*, 31 Cal. Rptr. 3d 880, 886 (Cal. App. 2005).

[60] *Id.* at 882.

[61] *Id.* at 882 n.2.

[62] *Id.* (internal citations omitted).

that "[i]f the critical point were the membership rights of certain voters (or rejected voters), obviously, surely the courts could not intervene to make membership decisions."[63] The court found that it did not have jurisdiction to interfere with the tribe's determination of membership because such a decision "would unavoidably have substantial and continuing effects on the Band's self-governance."[64]

The presence of disputed issues of tribal membership in this case therefore provides additional support for the superior court's dismissal for lack of subject matter jurisdiction.

### 4. Decisions involving the authority of an individual or group to exercise tribal authority

The Fifer Group attempts to recharacterize the issue as one of disputed tribal authority, arguing that this court has permitted an inquiry into the authority of tribal officials under tribal law to represent the tribe in state court proceedings. In *In re J.M.*, the case cited by the Fifer Group, we determined that the tribe's chief lacked the authority under the tribal constitution to unilaterally waive tribal court jurisdiction over a child custody matter.[65] The Fifer Group contends that the current case presents a similar question.

But our examination of tribal law in *J.M.* was performed under the auspices of the Indian Child Welfare Act's jurisdictional provision[66] and an express Congressional

---

[63]    *Id.* at 886.

[64]    *Id.*

[65]    718 P.2d 150, 154 (Alaska 1986).

[66]    25 U.S.C. § 1911(a) (2012) provides:

An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian

(continued...)

mandate "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families."[67] Examining tribal law to determine whether the tribe had expressly waived jurisdiction over an Indian child pursuant to 25 U.S.C. §§ 1911-1912 is not analogous to review of Healy Lake Village's tribal elections. We therefore conclude that *J.M.* is inapposite to the current tribal election dispute and similarly find unpersuasive the Fifer Group's citation to *Golden Hill Paugussett Tribe of Indians v. Town of Southbury*.[68]

### 5. Issues of comity and sovereign immunity

The Fifer Group also cites *John v. Baker* to argue that the state court should extend comity to the Tribe's own election dispute resolution.[69] However, these arguments beg the question whether the state court has subject matter jurisdiction to review the existence and content of a tribal election dispute resolution process under tribal law as well as to review the outcome of any such process when the outcome is disputed, as it is here. The Fifer Group does not explain how issues of comity can be addressed prior to a finding of subject matter jurisdiction.

---

[66](...continued)
> child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. Where an Indian child is a ward of a tribal court, the Indian tribe shall retain exclusive jurisdiction, notwithstanding the residence or domicile of the child.

[67]   *J.M.*, 718 P.2d at 152 (citing 25 U.S.C. § 1902 (1982)).

[68]   651 A.2d 1246 (Conn. 1995). *Golden Hill* did not involve a tribal election or membership dispute but rather the division of tribal leadership authority between a purported tribal chief and an elected tribal council. *Id.* at 1249.

[69]   982 P.2d 738, 762-64 (Alaska 1999).

Similarly, the superior court properly did not reach the merits of any sovereign immunity issues as it lacked subject matter jurisdiction to determine which group actually represented the Tribe and would therefore be entitled to raise a sovereign immunity defense.

Thus, the superior court properly dismissed this case for lack of subject matter jurisdiction because determining the real party in interest would have required the superior court to decide matters solely within the Tribe's retained inherent sovereignty.

## V. CONCLUSION

For the reasons set out in this opinion, we AFFIRM the superior court's dismissal for lack of subject matter jurisdiction.