Filed 7/12/23

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Tehama)

----

| | |
|---|---|
| GREENVILLE RANCHERIA, | C096097 |
| Plaintiff and Appellant, | (Super. Ct. No. 21CI000234) |
| v. | |
| ANGELA MARTIN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Tehama County, Jonathan W. Skillman, Judge. Reversed.

Peebles Kidder Bergin & Robinson, John M. Peebles, Gregory M. Narvaez, Tim Hennessy and Curtis Vandermolen for Plaintiff and Appellant.

Big Fire Law & Policy Group, Rose M. Weckenmann and Calandra Skye McCool for Defendants and Respondents.

1

Plaintiff Greenville Rancheria (Greenville) is a sovereign Indian tribe that owns administrative and medical offices (property) in the City of Red Bluff. Following a contested election, defendant Angela Martin was elected as Greenville's chairperson, which included the authority to act as Greenville's chief executive officer. After her election, Martin, along with approximately 20 people, including defendants Andrea Cazares-Diego, Andrew Gonzales, Hallie Hugo, Elijah Martin, and Adrian Hugo,[1] entered the property and refused to leave despite the remaining members of the tribal council ordering them to leave and removing Martin's authority as chairperson under Greenville's constitution.

Given defendants' failure to vacate the property, Greenville filed a verified emergency complaint for trespass and injunctive relief. The trial court granted Greenville a temporary restraining order, but later granted defendants' motion to dismiss the complaint for lack of subject matter jurisdiction. Greenville appeals. We reverse.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2021, Greenville held a contested election for all five of its tribal council positions. Defendants were members of a political party seeking to challenge the then-existing leadership. Martin was successful in securing the tribal chairperson/chief executive officer position in an at-large election. Defendants' party was unsuccessful at electing any other candidates to the tribal council. While defendants disputed the election results, they did not challenge the outcome pursuant to Greenville's constitution. The election results were ratified and sent to the Bureau of Indian Affairs (Bureau).

On September 29, 2021, a group of approximately 20 people, including defendants, entered the property, which was located entirely within the City of Red Bluff and owned in fee simple by Greenville. Once inside, defendants spoke loudly and

---

[1] We refer to all named defendants collectively as defendants and Angela Martin individually as Martin.

2

expressed disagreement with tribal operations. Martin ordered Greenville's staff to provide defendants with a "list of personal addresses for each of Greenville's members." Defendants directed Greenville's staff to make copies of letters, print address labels, and get envelopes, so that defendants could mail two separate mailings unrelated to Greenville's operations to all tribal members. Greenville's staff reported the incident to the tribal council.

That same day, defendants purported to hold a "Greenville Rancheria Tribal Membership Special Meeting" at which 27 Greenville members were present. Those 27 members voted, among other things, to suspend Greenville's vice-chairperson, secretary/treasurer, and tribal administrator pending an investigation. The members also voted to change the locks to the property and to authorize a new check signor on Greenville-related bank accounts. The members further declared tribal council positions vacant and filled them with other members.[2]

The next day, the tribal council adopted a resolution informing defendants their occupation of the property was unlawful and directing defendants to vacate the property. Defendants were served with the resolution the same day the tribal council passed it; they, however, refused to vacate the property. Instead, defendants attempted to change the locks on the property's doors. "Greenville's staff noticed the activity and the locksmith provided Greenville with the keys instead." Despite being ordered to leave, defendants maintained "persistent and daily occupation of the [p]roperty."

On October 1, 2021, Martin used her authority as chairperson to order three staff members into an unscheduled meeting with her. At the meeting, "Martin made statements about Greenville's employees being held responsible for decisions that the [t]ribal [c]ouncil may make, even if [the employees] did not take part in the decision."

---

[2]     Martin later admitted to the trial court that this was not a valid meeting.

3

Martin did not explain her statement and two of the employees in the meeting felt intimidated and believed Martin was threatening their jobs. Later that day, at a duly called tribal council meeting, the other four members of the tribal council passed a resolution suspending Martin's "actual or implied authority under the Constitution, and any attendant powers as the Chief Executive Officer of Greenville." The tribal council further "affirmed that it never authorized . . . Martin to exercise independent power under" Greenville's constitution and appointed Crystal Rios as acting chairperson. Following these actions, Greenville sent an e-mail to the Bureau questioning who the Bureau recognized as representing the tribe. A representative from the Bureau responded to the e-mail, requesting Rios to confirm her status as Greenville's acting chairperson. Greenville submitted to the Bureau the resolution passed by the majority of the tribal council suspending Martin as chairperson. In subsequent communications between the Bureau and Greenville related to funding through the Bureau, representatives from the Bureau addressed letters to Rios as the "Chairwoman" and "Acting Chairwoman" of Greenville.

On October 8, 2021, Greenville filed a verified emergency complaint for trespass and injunctive relief against defendants. It alleged defendants were overrunning its administrative and medical offices, "disrupting vital governmental and medical services," and "compromising the security of confidential medical, child-welfare[,] and financial records." Greenville alleged that, as a consequence of defendants' conduct, it was forced to close its medical and administrative offices located on the property. Greenville further alleged the trial court had jurisdiction over the matter pursuant to Code of Civil Procedure section 410.10 and that the property was "not within the boundaries of any Indian reservation" and was not on Indian land. As a prayer for relief, Greenville requested the trial court to "temporarily, preliminarily, and permanently enjoin . . . [d]efendants from entering, accessing, or loitering near" the property "for a period of one year, or shorter time if resolved by" the tribal council.

The trial court granted Greenville a temporary restraining order ordering defendants to vacate and stay away from the property. Defendants complied. The trial court then scheduled a hearing on Greenville's request for a permanent injunction.

Defendants filed a motion to dismiss the complaint for lack of subject matter jurisdiction. In the motion's supporting points and authorities, defendants argued that "California courts lack jurisdiction to make trespass determinations arising from" tribal leadership disputes or arising from disputes on tribal property among tribal members. (Capitalization omitted.) Greenville opposed the motion, arguing that the trial court's trespass determination did not depend on resolving any dispute regarding Greenville's internal governance and the dispute was not over Indian trust lands or land otherwise held by the federal government in trust for Greenville.

Greenville filed an opening brief in support of issuing a permanent injunction, asserting defendants committed a trespass and should be enjoined from entering the property for one year. Defendants refuted these claims in their own brief.

On February 18, 2022, the court held a hearing on the motion to dismiss. Defendants argued the dispute between the parties whittled down to whether Martin remained chairperson and chief executive officer of Greenville and thus had authority to enter the property. Defendants asserted this question was actively disputed by Greenville's membership. Defendants' attorney stated that Greenville did not have a tribal court available and agreed to have these matters resolved by the Bureau, which Martin was in the process of petitioning for resolution of the leadership dispute. Martin asserted that she was denied due process when the tribal council stripped her of her authority as chairperson without notice, and she planned to pursue a claim with the Bureau so that she could remain chairperson and chief executive officer of Greenville.

Greenville countered that there was no genuine leadership dispute because Martin was lawfully removed as chairperson under Greenville's constitution. Greenville asserted that the Bureau had no authority to determine who is the chairperson of the tribe.

5

Instead, the Bureau is merely responsible for ensuring the persons who contract on behalf of the tribe with the federal government represent the tribe. Here, the Bureau already made the determination that Rios represented the tribe as chairperson.

The trial court granted defendants' motion to dismiss for lack of subject matter jurisdiction, expressly finding that "California courts lack jurisdiction to make trespass determinations arising from intra-[t]ribal leadership disputes" and "California courts lack jurisdiction to make trespass determinations arising from disputes on [t]ribal property among [t]ribal [m]embers."

Greenville appeals.

DISCUSSION

I

*The Trial Court Does Not Lack Subject*

*Matter Jurisdiction Due To A Tribal Leadership Dispute*

Greenville contends the trial court erred by dismissing the complaint on the grounds that "California courts lack jurisdiction to make trespass determinations arising from intra-[t]ribal leadership disputes." Greenville argues this conclusion was error because the undisputed facts demonstrate there was no tribal leadership dispute and, even if there was a dispute, the court should defer to the Bureau when deciding who to recognize as leaders of Greenville. We agree with Greenville that no tribal leadership dispute exists.

A

*Appropriate Burden Of Proof*

Our Supreme Court has defined subject matter jurisdiction as "the power of the court over a cause of action or to act in a particular way." (*Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1035.) "By contrast, the lack of subject matter jurisdiction means the entire absence of power to hear or determine a case, i.e., an

6

absence of authority over the subject matter." (*Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 42.)

As it pertains to Indian tribes, state courts have no power to intervene in purely tribal matters. (*Lamere v. Superior Court* (2005) 131 Cal.App.4th 1059, 1067-1068.) "Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government. [Citations.] Although no longer 'possessed of the full attributes of sovereignty,' they remain a 'separate people, with the power of regulating their internal and social relations.' [Citations.] [Indian tribes] have [the] power to make their own substantive law in internal matters, [citations], and to enforce that law in their own forums." (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 55-56 [56 L.Ed.2d 106].) Thus, courts lack subject matter jurisdiction to determine the elected leadership, governance, or membership of Indian tribes. (*In re Sac & Fox Tribe of Mississippi in Iowa / Meskwaki Casino Litigation* (8th Cir. 2003) 340 F.3d 749, 763 (*Meskwaki Casino Litigation*).)

"The general rule is that subject matter jurisdiction is determined from the face of a well-pleaded complaint." (*Boisclair v. Superior Court* (1990) 51 Cal.3d 1140, 1156 (*Boisclair*).) Subject matter jurisdiction cannot be conferred by consent, waiver, or estoppel. (*People v. Williams* (1999) 21 Cal.4th 335, 340.) "A court has jurisdiction to determine its own jurisdiction, for a basic issue in any case before a tribunal is its power to act, and it must have authority to decide that question in the first instance." (*Rescue Army v. Municipal Court of City of Los Angeles* (1946) 28 Cal.2d 460, 464.)

Greenville contends we should not apply the above burden of proof—that plaintiffs must show subject matter jurisdiction from the face of the complaint—to our review of the trial court's order on defendants' motion to dismiss and whether the issue to be litigated relates to tribal self-governance. Instead, Greenville proposes we adopt the burden advanced in *People v. Miami Nation Enterprises* (2016) 2 Cal.5th 222, pertaining to whether tribal-affiliated entities are " 'sufficiently related to their respective tribes to

7

be protected by tribal sovereign immunity' " (*id.* at p. 233; *id*. at p. 236). Our Supreme Court concluded that a tribal-affiliated entity bears the burden of proving it is entitled to immunity by a preponderance of the evidence, and then the burden shifts to the plaintiff to prove the existence of jurisdiction through abrogation or waiver. (*Id.* at p. 236.)

When justifying its divergence from the typical burden for subject matter jurisdiction, our Supreme Court noted that tribal immunity does not implicate subject matter jurisdiction in the fundamental sense. (*People v. Miami Nation Enterprises*, *supra*, 2 Cal.5th at pp. 243-244.) Indeed, state courts are empowered to answer the underlying question that gave rise to the suit in *Miami Nation*, i.e., whether a state statute was violated. (See *id.* at pp. 229-230.) The issue before our Supreme Court was whether state courts were empowered to answer that question as it pertained to a particular entity. (See *id.* at p. 230.) Thus, tribal sovereign immunity does not pertain to subject matter in the fundamental sense given that it does not equate to an absence of authority over the subject matter.

That is not the case here. With this suit, we are not determining over whom we are empowered to exercise jurisdiction, but whether we are empowered to decide a particular subject that is reserved to the sole authority of a tribe. While the question underlying the suit is whether a trespass occurred such that a permanent injunction is necessary, the parties agree the answer to that question, in part, hinges on whether Martin has authority (1) to be on the property after the tribal council adopted a resolution informing defendants to vacate the property and (2) as chairperson of Greenville after the tribal council passed a resolution suspending her authority. Thus, the question before us pertains to subject matter jurisdiction in the fundamental sense and cannot be waived, contrary to Greenville's contention. (See *People v. Williams*, *supra*, 21 Cal.4th at p. 340.) Accordingly, we decline to adopt the burden shifting framework employed in sovereign immunity cases.

We will, however, look beyond the face of the complaint to determine subject matter jurisdiction. This is not to say the complaint filed here is insufficient, but "it is rare that a lack of subject matter jurisdiction will be disclosed by [a] plaintiff's complaint," and thus it is appropriate to look to the parties' declarations, admissions, or deposition testimony to inform the determination. (*Rowland v. County of Sonoma* (1990) 220 Cal.App.3d 331, 335.) After all, we have authority to determine our own jurisdiction, and subject matter jurisdiction can be raised at any time. (*Rescue Army v. Municipal Court of City of Los Angeles*, *supra*, 28 Cal.2d at p. 464; *Alliance for California Business v. State Air Resources Bd.* (2018) 23 Cal.App.5th 1050, 1060.) The parties' declarations and admissions are probative to that determination, and thus we consider them.

B

*There Is No Tribal Leadership Dispute*

"In the absence of conflicting extrinsic evidence relevant to the issue, the question of whether a court has subject matter jurisdiction over an action against an Indian tribe is a question of law subject to our de novo review." (*Lawrence v. Barona Valley Ranch Resort & Casino* (2007) 153 Cal.App.4th 1364, 1369.)

Taking the lead from the Supreme Court's decision in *Santa Clara Pueblo v. Martinez*, *supra*, 436 U.S. 49, courts have recognized that "the tribal self-government exception [to subject matter jurisdiction] is designed to except purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations from the general rule that otherwise applicable federal statutes apply to Indian tribes." (*Donovan v. Coeur d'Alene Tribal Farm* (9th Cir. 1985) 751 F.2d 1113, 1116; see *Apodaca v. Silvas* (5th Cir. 1994) 19 F.3d 1015; 1016; *Smith v. Babbitt* (8th Cir. 1996) 100 F.3d 556, 558-559.) Cases pertaining to subject matter jurisdiction involving questions related to tribal leadership are hard to come by in California state appellate courts. We thus look at how other jurisdictions have resolved this question.

9

In *Healy Lake Village v. Mt. McKinley Bank & Healy Lake Traditional Council* (Alaska 2014) 322 P.3d 866 (*Healy Lake*), the Supreme Court of Alaska considered whether it had subject matter jurisdiction to determine if a bank was required to change the signatory authority of a tribe's accounts to reflect a change in leadership. (*Id.* at p. 867.) There, two factions of tribal members claimed they were properly elected and served as the legitimate council. (*Ibid.*) Both factions argued the election that seated the other faction failed to comply with tribal law and regulations, each pointing to various violations of provisions in the tribe's constitution. (*Id.* at pp. 867-868.) Further, while one faction utilized the assistance of the Bureau for its election, the other faction's recognized chief signed on behalf of the tribe in contracts between the tribe and the United States Department of Transportation. (*Id.* at p. 868.) The Supreme Court of Alaska determined it did not have subject matter jurisdiction over the case because the claims to be resolved depended on first resolving who was the leadership of the tribe. The court noted that both factions offered conflicting facts about who was the legitimate tribal council and conflicting interpretations of tribal laws. (*Id.* at p. 873.) Ultimately, the Alaska Supreme Court concluded its decision depended on an evaluation of alleged violations of tribal law and contested definitions of tribal membership, and thus it lacked subject matter jurisdiction. (*Ibid.*)

Similarly, the Eighth Circuit Court of Appeals determined it did not have jurisdiction over a dispute arising between two factions of a tribe competing for control of a tribal government. (*Meskwaki Casino Litigation*, *supra*, 340 F.3d 749.) The incumbent faction had been in power prior to 2003, and an opposition faction submitted petitions to the incumbent faction challenging its authority. (*Id.* at p. 751.) According to the tribal constitution, receipt of this type of petition mandated a special election, but the incumbent faction did not call an election. (*Ibid.*) Subsequently, the opposition faction formed a new tribal government and gained control of some of the tribe's assets, including the tribal casino. (*Id.* at pp. 751-752.) The opposition faction notified the

10

banks that held gaming proceeds that it was the only faction with authority to act on behalf of the tribal accounts. (*Id*. at p. 752.) "Faced with uncertainty over which [faction] possessed authority to act on behalf of the [t]ribe, the banks froze" the accounts. (*Ibid.*) The Eighth Circuit Court of Appeals determined it could not resolve either faction's claims against the banks because the claims sought a form of relief dependent on resolution of an internal tribal leadership dispute. (*Id.* at p. 767.)

These cases concluded a leadership dispute prevented subject matter jurisdiction when the court was called upon to interpret tribal laws and resolve disputed facts between two factions asserting entitlement to tribal leadership.[3] (*Meskwaki Casino Litigation*, *supra*, 340 F.3d at pp. 751-752, 767; *Healy Lake*, *supra*, 322 P.3d at p. 873.) A California court has had occasion to address a similar question in the context of the state's regulatory authority over tribes. In *California Valley Miwok Tribe v. California Gambling Control Com.* (2014) 231 Cal.App.4th 885 (*California Valley*), a question before the court was whether a tribe was "currently in the middle of an unresolved dispute over its leadership and membership." (*Id.* at p. 904.) Our colleagues in Division One of the Court of Appeal, Fourth Appellate District determined the answer was yes (*ibid*.) given the long and tortured relations between two factions of the California Valley Miwok Tribe—the Burley faction and the Yakima faction (*id*. at pp. 891-892). In the late 1990's, each faction attempted to organize the tribe under federal law by submitting to the Bureau competing constitutions and forms establishing a person from each faction as

---

[3]     We decline Greenville's proposition to defer only to the Bureau's recognition of tribal authority. While the entity our federal government recognizes for the purposes of government-to-government relations is relevant, it is one circumstance to take under consideration when determining subject matter jurisdiction. Indeed, in the *Healy Lake* case, the Bureau recognized a different tribal representative than another federal agency. (*Healy Lake*, *supra*, 322 P.3d at p. 868.) And, as this case and others demonstrate, tribal disputes evolve quickly and sometimes before the Bureau is aware of the full facts alleged in complaints courts are called to rule upon.

chairperson of the tribe. (*Ibid*.) The Bureau issued payments to the tribe despite challenges by the Yakima faction and ongoing internal disputes between the factions regarding leadership. (*Id.* at pp. 892-893.)

Then in the mid-2000's, the Bureau rejected a new tribal constitution from the Burley faction because " 'it did not appear that [the] Burley [faction] had made any effort to include the whole tribal community . . . .' in the process." (*California Valley*, *supra*, 231 Cal.App.4th at p. 893.) In 2005, the Bureau stopped recognizing any tribal government because it found the tribe was not organized under federal law. (*Ibid*.) The Bureau's decision withstood challenge in federal court. (*Ibid*.) In 2010, after efforts from the Bureau to assist the tribe in organizing, the Bureau rescinded its prior position that it would not recognize the tribe's government and recognized the Burley faction as the legitimate leadership of the tribe. (*Id.* at p. 894.) The Yakima faction challenged this decision, and the Bureau's decision was overturned by the federal court. (*Id.* at pp. 894-895.)

The Court of Appeal, Fourth Appellate District, Division One, found these facts established that "a tribal leadership and membership dispute currently exist[ed] . . . ." (*California Valley*, *supra*, 231 Cal.App.4th at p. 900, italics & capitalization omitted.) In coming to this conclusion, the court held that the tribe had experienced a leadership dispute since the late 1990's as demonstrated by various court actions and the Bureau's decision to recognize the Burley faction had not settled the dispute because the decision was overturned by the federal court. (*Id.* at pp. 900-902.) The Fourth District rejected the Burley faction's reliance on correspondence from the Bureau recognizing Burley as the legitimate chairperson because the correspondence did not pertain to a determination of leadership and because the correspondence occurred prior to the federal order overturning the Bureau's recognition of the Burley faction as tribal leadership. (*Id.* at pp. 902-903.) It similarly dismissed the Burley faction's reliance on the Bureau's recognition of the tribal name change initiated by the Burley faction in 2001 because the

12

Bureau's recognition was before the federal court ordered the Bureau to withdraw its recognition of the Burley faction as the leadership of the tribe. (*Id.* at pp. 903-904.)

The *California Valley* court also considered and then distinguished the facts of *Timbisha Shoshone Tribe v. Salazar* (D.C. Cir. 2012) 678 F.3d 935 (*Timbisha*) because the tribal dispute at the center of that case was settled (*California Valley*, *supra*, 231 Cal.App.4th at p. 903). In *Timbisha*, the District of Columbia Circuit Court of Appeals found no ongoing dispute for the purposes of determining whether a faction of a tribe had standing to sue. (*Timbisha*, at pp. 937-939.) At the time the suit was filed in that case there were two factions claiming leadership of the tribe—the Kennedy faction and the Gholson faction—and the federal government did not recognize either one. (*Id.* at p. 937.) Before the appeal was heard, the federal government recognized the Gholson faction "for 'a limited time and for a limited purpose of conducting government-to-government relations necessary for holding a special election' to determine who constituted the [t]ribal [c]ouncil." (*Ibid.*) After the election was held, the Gholson faction was declared the winner and the results were eventually certified. (*Id.* at p. 937.) The Bureau recognized in a letter that the Gholson faction represented the tribe's leadership. (*Id.* at pp. 937-938.) The Kennedy faction challenged the Bureau's recognition in the Eastern District of California, which was pending at the time the District of Columbia Circuit Court of Appeals was to determine whether the Kennedy faction had standing to sue on behalf of the tribe. (*Id.* at p. 938.)

The District of Columbia Circuit Court of Appeals determined the Kennedy faction did not have standing given the currently settled tribal leadership dispute. It reasoned, "It is a 'bedrock principle of federal Indian law that every tribe is "capable of managing its own affairs and governing itself." ' [Citations.] The [Bureau]'s letter acknowledges that the [tribe] resolved their own leadership dispute through a valid internal tribal process. [Citation.] [¶] The Second Circuit has noted that '[t]he [federal government's] determination that [plaintiffs' claimed leader] does not represent . . . [the

13

tribe] may well moot [the] plaintiffs' claims.' [Citation.] We agree. In these circumstances, we owe deference to the judgment of the Executive Branch as to who represents a tribe. [Citations.] There is no dispute here that [the Bureau]'s letter is authentic and constitutes final agency action. [Citation.] [¶] The Kennedy faction is unhappy with how the election was run, who voted, and the results, but ours is not the forum for that debate. Both parties agreed at oral argument that we have all the necessary facts to decide whether the [Kennedy faction] ha[s] standing to bring this suit, and we need not remand to the district court. [Citation.] The fact is that we have a letter from the Executive Branch recognizing the Gholson faction, and we must not turn a blind eye to facts in assessing jurisdiction. [Citation.] . . . [¶] Our decision has no impact on the litigation in the Eastern District of California or, if that litigation is successful, on the plaintiffs' ability to re-file this lawsuit. [Citation.] We only consider standing, and we conclude that the Kennedy faction has none." (*Timbisha*, *supra*, 678 F.3d at pp. 938-939, italics omitted.)

Returning to *California Valley*, the Court of Appeal, Fourth Appellate District, Division One also distinguished *Goodface v. Grassrope* (8th Cir. 1983) 708 F.2d 335 (*Goodface*), based on the particular issue presented in that case (*California Valley*, *supra*, 231 Cal.App.4th at p. 911, fn. 25). Whereas *California Valley* determined whether a state agency could withhold monetary disbursements to a tribe given the tribe's clearly disputed leadership (*ibid*.), *Goodface* determined which of two factions the Bureau must recognize for the purpose of government-to-government relations (*Goodface*, at pp. 338-339). In *Goodface*, the Bureau determined it could not intervene in a tribal election dispute when a former tribal council refused to recognize the authority of a newly elected tribal council. (*Id.* at pp. 336, 338-339.) Instead, the Bureau decided to correspond with both tribal councils on an interim basis so it could provide necessary services to the tribe pending internal tribal resolution of the dispute. (*Id*. at p. 337.) The Bureau's decision was challenged in the district court, where the district court examined the tribe's

14

constitution and bylaws, addressed the merits of the election dispute, determined that the newly elected council was entitled to recognition, and issued an order requiring the Bureau to recognize the new council. (*Id*. at p. 339.)

The Eighth Circuit Court of Appeals reversed the district court's order holding that by recognizing both factions, the Bureau in effect recognized neither faction when it was required to recognize a tribal authority. (*Goodface*, *supra*, 708 F.2d at p. 339.) The Eighth Circuit then instructed the district court to order the Bureau to recognize the newly elected tribal council on an interim basis and await a final tribal determination as to leadership. (*Ibid*.) The Eighth Circuit specifically found that the district court acted without authority when it interpreted the tribal constitution and bylaws and addressed the merits of the election dispute. (*Ibid*.)

The *California Valley* court also distinguished *Goodface* by finding the holding in that case was applicable to the specific facts presented. (*California Valley*, *supra*, 231 Cal.App.4th at p. 911, fn. 25.) Indeed, "*Goodface* concerned a specific situation in which the [Bureau] was already dealing with an Indian tribe in a government-to-government relationship and providing needed federal benefits to the reservation when a tribal election dispute arose involving improprieties during the election process, calling into question whether the new tribal council was the legitimate tribal government or whether the old tribal council should stay in place until a new election could be called. [Citation.] *Goodface* held that the [Bureau] erred by refusing to recognize either government because the [Bureau] was 'obligated to recognize and deal with some tribal governing body' so that it did not jeopardize the continuation of necessary day-to-day services on the reservation. [Citation.] Based on 'equitable principles,' *Goodface* concluded that the [Bureau] should deal with the tribal council that had been certified and sworn in after the tribal election. [Citation.] It is clear from *Goodface*'s discussion that it did not purport to establish a rule applicable to all situations. The decision was reached on pragmatic and equitable grounds." (*California Valley*, at p. 911, fn. 25.)

15

In cases decided since *Goodface*, the holding has been described as "where tribal leadership is in dispute, the [Bureau] abuses its discretion under the [Administrative Procedures Act] by failing to take sides until the tribe sorts out the dispute internally. [Citations.] Still, a federal agency or court should not address the merits of a tribal election dispute, so long as there is a functional tribal court that can sort out the dispute internally. [Citations.] Where there is no functional tribal court, and the dispute is in danger never of being sorted out internally within the tribe, the [Bureau], and then a federal district court, may have to address the merits of the dispute." (*Winnemucca Indian Colony v. U.S. ex rel. Dept. of the Interior* (D. Nev. 2011) 837 F.Supp.2d 1184, 1191.)

Taking into consideration the varying factual circumstances and legal conclusions discussed in the preceding cases, we conclude there is no tribal leadership dispute preventing subject matter jurisdiction in this case. We are guided by the " 'bedrock principle of federal Indian law that every tribe is "capable of managing its own affairs and governing itself." ' " (*Timbisha*, *supra*, 678 F.3d at p. 938.) This is especially true on matters of elected leadership, governance, and membership. (*Meskwaki Casino Litigation*, *supra*, 340 F.3d at p. 763.) Further, courts do not have authority to interpret tribal constitutions or laws as to address the merits of election or leadership disputes. (*Goodface*, *supra*, 708 F.2d at p. 339.)

It is also important to consider the posture of this case. The parties agree Martin was elected as Greenville's chairperson and that the rest of the tribal council passed, either validly or invalidly, resolutions to suspend her authority and order defendants to vacate the property. The remaining members of the tribal council did this without notifying Martin of their intent to suspend her authority and without providing her with an opportunity to be heard before the vote was taken. Defendants summarize the facts of this case as "represent[ing] an internal tribal dispute that arose following a contested election." Not so. The undisputed facts are that defendants never challenged the election

16

resulting in Martin being elected chairperson through any official means under Greenville law or through the Bureau. Further, the facts do not show that Martin has challenged her suspension pursuant to Greenville law or by filing an administrative action with the Bureau. Indeed, the hearing on defendants' motion to dismiss was held in February, four months after defendants vacated the property and Martin was suspended as chairperson. Martin had not challenged her suspension by the time of the hearing and there is nothing to indicate she has done so now.

Further, Greenville, as a tribe, is suing on behalf of itself. Defendants do not assert that the tribal council, as currently constituted, lacks standing to sue on behalf of Greenville. Greenville is currently recognized by the Bureau as a federally organized tribe. While the Bureau has not corresponded with Greenville specifically acknowledging settlement of the leadership dispute, as was the case in *Timbisha*, *supra*, 678 F.3d at pages 937 to 938, the Bureau is in receipt of the resolution suspending Martin's authority under Greenville's constitution and appointing Rios as interim chairperson. As a result, the Bureau began communicating with Greenville through Rios as chairperson. While not determinative, as was the case in *Timbisha*, Rios's documented status with the Bureau is entitled to some deference. (See *id.* at pp. 938-939.)

Ultimately, there is nothing calling into question the current tribal council's authority to act on behalf of Greenville as a sovereign nation. Thus, we assume the resolution suspending Martin of her authority as chairperson is valid under Greenville's constitution, as is the resolution ordering defendants to vacate the property. While Martin may challenge Greenville's removal of her as chairperson through the Bureau, that potentiality does not serve to dilute Greenville's sovereignty today. By passing the resolutions, the tribal council, i.e., Greenville, ordered that to the extent defendants' claims to leadership or defenses to trespass rest on tribal law, the issues must be resolved against them.

17

Further, Martin does not purport to act on behalf of Greenville. Martin acknowledged to the trial court that the membership meeting led by defendants purporting to unseat several tribal councilmembers was not a valid meeting and did not result in any leadership change to Greenville's tribal council. While Martin held authority as chairperson and chief executive officer of Greenville, defendants as a group do not control Greenville's assets or administer any of Greenville's funded programs. Unlike the case in *Meskwaki Casino Litigation*, where the opposition faction took control of a casino and its operation (*Meskwaki Casino Litigation*, *supra*, 340 F.3d at pp. 751-752), defendants acknowledge they hold no authority over tribal matters as demonstrated by their acknowledgement that the meeting held in the property was invalid. Defendants also have never been recognized by any federal agency for the purposes of contracting, as was the case in *Healy Lake*. (*Healy Lake*, *supra*, 322 P.3d at p. 868.) We are not called upon to choose between two factions claiming to have won elections or engaging in active litigation or claims before the Bureau, as were the facts in all the cases accounted above. (*Timbisha*, *supra*, 678 F.3d at p. 938; *Meskwaki Casino Litigation*, at pp. 751-752; *Goodface*, *supra*, 708 F.2d at pp. 339-340; *California Valley*, *supra*, 231 Cal.App.4th at pp. 891-896; *Healy Lake*, at pp. 867-868.)

Here, we are presented with a tribal chairperson removed from power through the acts of tribal councilmembers empowered to act on behalf of the tribe. Martin claims only that she was denied due process, and Martin may be right. But we are not the forum to entertain such a claim and we must defer to Greenville's determination of the dispute. (See *Timbisha*, *supra*, 678 F.3d at pp. 938-939; see also *Goodface*, *supra*, 708 F.2d at p. 339.)

Defendants disagree with our conclusion that subject matter jurisdiction exists here, citing *Ackerman v. Edwards* (2004) 121 Cal.App.4th 946. This case does not assist defendants. There, the plaintiffs were members of the Redding Rancheria Tribe and filed a petition for writ of mandate against members of the Redding Rancheria tribal council

18

challenging a resolution adopting procedures for reexamining membership status. (*Id.* at pp. 948, 950.) The plaintiffs claimed the resolution violated the tribe's constitution. (*Id.* at p. 948.) We held the plaintiffs did not demonstrate the tribe's constitution contained a private right of action, and thus the courts lacked subject matter jurisdiction to rule on claims related to the tribe's internal governance. (*Id.* at p. 955.) In *Ackerman*, we deferred to the tribe on issues of internal governance. (*Id.* at pp. 951-952, 955.) We do the same here. Consequently, we conclude there is no tribal leadership dispute preventing subject matter jurisdiction in this case because the facts demonstrate the tribe has settled the dispute.

II

*Public Law No. 280 Does Not Deprive The Trial Court Of Jurisdiction*

The trial court found it lacked subject matter jurisdiction because "California courts lack jurisdiction to make trespass determinations arising from disputes on [t]ribal property among [t]ribal [m]embers." As support for this conclusion, defendants argued in the trial court, and again on appeal, that Public Law No. 280 (Pub.L. No. 83-280 (Aug. 15, 1953) 67 Stat. 588-590 (Public Law 280)), as codified at title 28 United States Code section 1360 (section 1360) and discussed in *Boisclair, supra*, 51 Cal.3d 1140, prevent state court jurisdiction in this case. We disagree.

" ' "The policy of leaving Indians free from state jurisdiction and control" ' " "has two independent but interrelated bases: federal preemption and the internal sovereign rights of Indian tribes." (*Boisclair, supra*, 51 Cal.3d at p. 1147, quoting *McClanahan v. Arizona State Tax Comm'n* (1973) 411 U.S. 164, 168.) "In more recent times, courts have come to favor federal preemption over inherent sovereignty as the primary justification for the preclusion of state authority over Indian affairs. [Citation.] The basis for this assertion of exclusive federal authority over Indian affairs is rooted in three provisions of the United States Constitution: the Indian commerce clause (art. I, § 8, cl. 3), which gives Congress the exclusive power to control Indian commerce; the treaty

19

clause (art. II, § 2, cl. 2); and the supremacy clause (art. VI, cl. 2), which, together with extensive congressional legislation on Indian affairs, has broadly preempted state law." (*Boisclair*, at p. 1148.)

"Under Public Law 280, Congress granted California and five other states plenary criminal jurisdiction over 'offenses committed by or against Indians' within Indian country [citations], and limited civil jurisdiction over 'causes of action between Indians or to which Indians are parties' in cases arising in Indian country [citations]. Construing the statute narrowly so that it does not grant these states general civil regulatory control over Indian tribes, the high court held in *Bryan v. Itasca County* (1976) 426 U.S. 373, 385 [48 L.Ed.2d 710, 96 S.Ct. 2102] . . . that section 4 of Public Law 280 confers limited adjudicative jurisdiction to resolve private civil disputes." (*People ex rel. Becerra v. Huber* (2019) 32 Cal.App.5th 524, 533-534, fns. omitted.)

In *Boisclair*, *supra*, 51 Cal.3d at pages 1147 to 1157, our Supreme Court examined section 1360(b), which limits state civil jurisdiction by providing that " '[n]othing in this section . . . shall confer jurisdiction upon the State to adjudicate . . . the ownership or right to possession' " of any Indian property that is " 'held in trust by the United States or is subject to a restriction against alienation imposed by the United States.' " (*Boisclair*, at p. 1147, fn. 4.)

Our Supreme Court noted that statutes passed for the benefit of Indians are to be liberally construed in favor of Indians. (*Boisclair*, *supra*, 51 Cal.3d at p. 1153.) It therefore interpreted section 1360(b) as "preclud[ing] states from asserting jurisdiction over *disputes* concerning Indian land, including . . . disputes in which one party claims the disputed property is non-Indian. . . . [I]n order for section 1360(b)'s jurisdictional preclusion to operate and its protective purpose to be fulfilled, the threshold question must be whether one possible outcome of the litigation is the determination that the disputed property is in fact Indian trust land. If that outcome is possible, then a state court is barred from assuming jurisdiction of the case." (*Boisclair*, at p. 1152.) Our

20

Supreme Court concluded, "[S]tate court jurisdiction is barred whenever one litigant claims the disputed property is Indian trust land." (*Id.* at p. 1153.)

Here, defendants do not assert the property is Indian trust land and they acknowledge Greenville owns the property in fee simple. Instead, they argue that the same type of property rights at issue in *Boisclair* are at issue here. Specifically, that Indian title is unique in that it " 'bestows a right not of ownership but of occupancy.' " (Boldface omitted.) The argument continues that, because Greenville represents all members of the tribe through the tribe's constitution, the same rights of occupancy every tribe has been granted by the federal government flow to the tribe members individually. Not so.

The language defendants rely on from *Boisclair* was said in the context of lands held in trust for Indian tribes by the federal government, e.g., reservations. (*Boisclair*, *supra*, 51 Cal.3d at pp. 1148-1149.) As our Supreme Court in *Boisclair* explained, "As stated [by the Supreme Court], Congress intended section 1360(b) to help preserve the property base of the reservation system. One cornerstone of that system is the exclusive and protective federal jurisdiction over Indian trust land and Indian allotments, and the requirement of prior federal approval for any alienation of Indian property in order to prevent the loss of reservation land to market forces and state taxation. Section 1360(b) seeks to maintain that protective exclusivity by denying to states the ability both to legislate concerning Indian property and to adjudicate disputes involving that property." (*Id.* at pp. 1153-1154.) Thus, exclusive federal jurisdiction flows from the interest the federal government has in the land in dispute. Further, section 1360(b) expressly limits its application to land "that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States." That is not the case here, where neither party claims the federal government has ownership or a possessory interest in the property. Thus section 1360(b) does not deprive the trial court of jurisdiction in this dispute.

21

Defendants have not pointed to any authority demonstrating the federal government's intent to preempt state law or deprive state courts of subject matter jurisdiction in property disputes between tribal members occurring on lands outside tribal trust lands.  (See *Loma Portal Civic Club v. American Airlines, Inc.* (1964) 61 Cal.2d 582, 591 [preemption depends on "whether the enforcement of state law would conflict with the purposes of the federal legislation, whether by frustrating an affirmative federal purpose or by interfering with a matter intentionally left unregulated by Congress"].) Indeed, "[t]he definition and adjustment of property rights and the protection of health and welfare are matters primarily of state law." (*Id.* at p. 592.)  To conclude we lack jurisdiction over property disputes between tribal members on nontribal lands would limit tribal members' access to state court, especially considering California courts have subject matter jurisdiction pursuant to Public Law 280 over property disputes between tribal members on tribal trust lands.  (Section 1360.)  Consequently, the state court has jurisdiction to hear Greenville's dispute against defendants regarding land it owns in fee simple that is not held in trust by the federal government.[4]

---

[4]     Defendants argue that whether they, as members of Greenville, have a right to occupy the property depends on an interpretation of Greenville's constitution, which they claim gives them the right to occupy all tribally owned land whether that land is held in trust by the federal government or not.  Defendants urge us to leave this interpretation of Greenville's constitution to Greenville's internal resolution at a tribal forum.  As described in the prior section of this opinion, Greenville has settled this dispute in a tribal forum by Greenville's tribal council ordering defendants to vacate the property.  We must respect Greenville's sovereignty by recognizing its determination.  In the event the internal tribal resolution evolves, the parties are welcome to petition the trial court for an order complying with the current state of the facts.  Until that time, we must defer to Greenville's resolution of tribal disputes.

## III

### *Remand Is Appropriate*

Greenville contends that instead of remanding the matter for the trial court's consideration of Greenville's trespass claim, we should instruct the lower court to enter judgment in favor of Greenville and issue a permanent injunction against defendants for one year. Greenville believes that a finding of subject matter jurisdiction equates to a finding of trespass because defendants' only asserted defense to the trespass allegation is that they have authority to occupy the property. By concluding Martin is no longer chairperson of Greenville, the argument continues, the question of whether she and defendants have such authority has been resolved.

Whether a party has met its burden to prove a cause of action is a highly factual inquiry typically reserved for the trial court which is in the best position to hear and consider such facts. (See *In re Daisy D*. (2006) 144 Cal.App.4th 287, 292.) Whether to grant an injunction and the scope of that injunction is similarly left to the sound discretion of the trial court. (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.)

Given Greenville's requested relief, whether a trespass occurred is not as pertinent as the scope of the alleged trespass and whether it justifies a permanent injunction. The parties dispute the facts relevant to this inquiry and what the scope of the injunction should be. Thus, we will leave it to the trial court to decide this issue in the first instance.

## DISPOSITION

The judgment is reversed.  Greenville shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/_____
ROBIE, J.


We concur:


/s/_____
EARL, P. J.


/s/_____
HORST, J.*

---

\*      Judge of the Placer County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.